JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
**ROBERT B. FIRPO, CALIFORNIA STATE BAR NO. 243991**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
1290 W. MYRTLE STREET, SUITE 500
BOISE, ID  83702
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-9375
Email: Robert.Firpo@usdoj.gov

Attorneys for Plaintiff United States

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>RYAN HATCH, ALBAN HATCH, AMERICA HEALTH, INC., AAA AMERICAN HEALTHCARE, LLC dba AMERIHEALTH,[1] STAT DIAGNOSTICS, INC., and AMERICA HEALTHCARE, INC.,<br><br>        Defendants. | Case No._____<br><br>**COMPLAINT** |

The United States of America (United States) files this Complaint against Ryan Hatch and Alban Hatch ("the Hatches"), and America Health, Inc., AAA American Health Care, LLC dba as AmeriHealth, Stat Diagnostics, Inc., and America Healthcare, Inc. (the "Corporate Defendants," or together with the Hatches, "Defendants") for violations of the False Claims Act

---

[1] These defendants are unrelated to Amerihealth New Jersey Holdings, LLC, AmeriHealth HMO, Inc., AmeriHealth Insurance Company of New Jersey, or Amerihealth Caritas, or any Amerihealth entities related to those entities named in this footnote.

COMPLAINT – 1

(FCA), *see* 31 U.S.C. § 3729, and the Controlled Substances Act (CSA), *see* 21 U.S.C. §§ 801-904.  The allegations in this Complaint stem from Defendants' ownership and unlawful operation of the AmeriHealth medical clinics in eastern Idaho, as well as loans Defendants received under the Paycheck Protection Program (PPP) during the Covid-19 pandemic.

## I.  JURISDICTION

1.  This is an action brought by the United States for civil monetary penalties and damages authorized by the FCA and CSA for prohibited acts outlined in 31 U.S.C. § 3729(a) and 21 U.S.C. § 842(a).  *See also* 21 U.S.C. § 842(c) (authorizing civil penalties under the CSA); 31 U.S.C. § 3729(a)(1) (authorizing civil penalties and other damages under the FCA).  The Court has jurisdiction over the subject matter of this suit pursuant to both 28 U.S.C. § 1355 and 28 U.S.C. § 1345.  The Court has supplemental jurisdiction to entertain federal common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

## II. PARTIES

2.  Plaintiff United States is a sovereign nation acting on behalf of the U.S. Department of Health and Human Services (HHS), the Small Business Administration (SBA), and the Drug Enforcement Administration (DEA).

3.  The Hatches are businessmen and owners of the AmeriHealth health clinics in eastern Idaho.  The Hatches reside and conduct business in Idaho and within the jurisdiction of this Court.

4.  Corporate Defendants are entities formed by the Hatches under the laws of the State of Idaho, and are the legal entities though which the Hatches operate the AmeriHealth health clinics, and through which the Hatches secured loans and forgiveness of loans under the PPP.

## III. VENUE

5.     Venue is proper in the District of Idaho because (a) Defendants reside and conduct business within the District, (b) a substantial portion of the events giving rise to the action occurred in the District, and (c) the civil penalties sought by the United States accrued in the District.  *See* 28 U.S.C. § 1391(b); 28 U.S.C. § 1395(a).  Pursuant to District of Idaho Local Civil Rule 3.1, venue is proper in the District's Eastern Division.

## IV. CONTROLLED SUBSTANCES ACT

6.     Congress passed the Controlled Substances Act (CSA) in 1970 after determining that the illegal distribution and use of controlled substances had "a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2).

7.     The CSA governs the manufacture, distribution, and dispensation of controlled substances in the United States.  A "controlled substance" is any drug or other substance included in schedule I, II, III, IV, or V of the CSA.  *See* 21 U.S.C. § 802(6).

8.     Because one of the goals of the CSA is to prevent the diversion of drugs from legitimate to illegitimate channels, the CSA established a closed regulatory system in which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.

9.     In order to track the legitimate dispensation of controlled substances, the CSA requires practitioners that wish to write prescriptions for controlled substances to register with the Drug Enforcement Administration (DEA).  *See* 21 U.S.C. § 822(a)(2); 21 U.S.C. § 802(10) (definition of term "dispense"); *and also* 21 U.S.C. § 802(21) (definition of "practitioner"). Practitioners registered with the DEA to dispense controlled substances are authorized to

dispense only to "the extent authorized by their registration," and must do so in conformity with the CSA. *See, e.g.,* 21 U.S.C. § 822(b); 21 C.F.R. § 1306.04.

10. A practitioner who writes a prescription for a controlled substance "dispenses" a controlled substance under the CSA, *see* 21 U.S.C. § 802(10), and therefore may be liable for violations of the CSA. A business entity or corporation that employs prescribers of controlled substances may be vicariously liable for the acts of its prescribers, and therefore may also be civilly liable under the CSA.

11. Under the CSA, a prescription for a controlled substance is only valid, lawful and effective if it is issued for a legitimate medical purpose and by a practitioner acting in the usual course of professional practice. *See* 21 C.F.R. § 1306.04; *see also* Idaho Code § 37-2722; IDAPA 24.36.01, Rule 400 (noting nearly identical requirements for a prescription to be valid under Idaho State law). A prescription for a controlled substance that has not been issued for a legitimate medical purpose and is not issued by a practitioner acting in the usual course of professional practice is not a lawful or valid prescription under the CSA.

## V. THE FALSE CLAIMS ACT

12. The FCA provides, in part, that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties if that claim is presented to the United States. *See* 31 U.S.C. §§ 3729(a)(1)(A)-(B).

13. The FCA is the United States' primary civil litigation tool against fraud perpetrated by those who wrongfully obtain money from federally funded programs. The purpose of the FCA, in part, is to provide restitution to the government for money taken from it

by fraud and to make the government whole.  However, the FCA also authorizes the government to collect civil penalties and damages.

14. Any person who violates the FCA is liable to the United States for a mandatory civil penalty for each violation of the FCA, as well as for treble damages sustained by the United States with respect to each violation.  *See* 31 U.S.C. § 3729(a).

15. For FCA civil penalties assessed after November 2, 2015, the current minimum mandatory civil penalty is $13,508 per violation and the maximum civil penalty is $27,018 per violation.  *See* 28 C.F.R. § 85.5; 31 U.S.C. § 3729(a).

## VI. THE ANTI-KICKBACK STATUTE

16. The Anti-Kickback Statute (AKS) prohibits, *inter alia*, receiving, soliciting, paying or offering any remuneration in exchange for referring an individual for services which may be paid in whole or in part by federal health care programs, including Medicare or Medicaid.  *See* 42 U.S.C. § 1320a-7b(b).

17. A claim to a federal health care program that is tainted by a violation of the AKS, constitutes a false or fraudulent claim for the purposes of the False Claims Act.  *See* 42 U.S.C. § 1320a-7b(g).

## VII. FACTUAL BACKGROUND

18. In 2012, the Hatches formed Corporate Defendants under the laws of the State of Idaho for the purpose of purchasing and/or operating health care clinics for profit.  Between 2012 and 2022, the Hatches formed other business entities and/or registered assumed business names to further their healthcare businesses and/or protect their financial interests in those businesses.  Additional entities formed by the Hatches between 2012 and 2022 included Stat Diagnostics, Inc., AmeriHealth, Inc., and America Healthcare, Inc.

19.  By 2018, the Hatches operated multiple health clinics under the name AmeriHealth.  The Hatches employed doctors, nurse practitioners, and medical assistants to staff the clinics and provide patient care.  Among other things, the clinics provided patients with urgent care, drug treatment, and pain management services.  The clinics treated a large number of patients insured by federal health care programs like Medicare and Medicaid, and as a result, Defendants billed federal insurance programs for services provided to their patients by their medical providers.

20.  As part their drug treatment and pain management services, Defendants needed and expected their doctors and nurse practitioners to prescribe controlled substances.  Accordingly, Defendants hired doctors and nurse practitioners who were registered to prescribe controlled substances with the DEA and the Idaho State Board of Pharmacy.

### Scheme to Defraud Regarding Prescriptions and Billing

21.  Defendants recklessly hired, and failed to properly supervise, inexperienced or compromised medical practitioners to staff the AmeriHealth medical clinics and treat AmeriHealth patients.  Defendants hired such practitioners because such practitioners could be hired at reduced cost to Defendants and were less compliant with respect to rules regarding billing insurance companies, including Medicare and Medicaid, for unnecessary and/or worthless services.

22.  Defendants recklessly hired and failed to properly supervise such inexperienced or compromised practitioners who then wrote more, and sometimes unnecessary or unsafe, prescriptions for controlled substances to AmeriHealth patients.  Defendants' recklessness in hiring and supervising such practitioners created an environment in which drug-seeking patients would schedule office visits that could then be billed to insurance.

23.     Between 2016 and 2022, while employed by Defendants and under Defendants' reckless supervision, these practitioners improperly issued prescriptions, billed insurance, and caused false claims to be submitted to Medicare, Medicaid, and Tricare.  Among others, those practitioners included Prescriber 1 and Prescriber 2.

### Prescriber 1

24.     Defendants hired Prescriber 1 as a Nurse Practitioner in 2018.  Defendants knew or should have known that Prescriber 1 had problems with alcohol and substance abuse at the time that they hired Prescriber 1.

25.     Defendants originally hired Prescriber 1 to manage medications for psych patients.  However, within six months of hiring Prescriber 1, Defendants directed Prescriber 1 to see and treat pain management patients.  Defendants expected Prescriber 1 to prescribe pain management patients controlled substances as needed.  When Defendants hired Prescriber 1, Defendants knew or should have known that Prescriber 1 lacked a pain management certification.

26.     Given Prescriber 1's known problems with alcohol and substance abuse, Prescriber 1 did not want to treat or prescribe controlled substances to pain management patients.  However, Defendants nevertheless pressured Prescriber 1 to see pain management patients so that Defendants could increase revenue.  Defendants further pressured Prescriber 1 to prescribe controlled substances to patients to keep those patients satisfied with AmeriHealth's medical services.

27.     Defendants knew or should have known Prescriber 1 continued to abuse alcohol and other substances while Prescriber 1 worked at AmeriHealth between 2018-2020.  However, Defendants continued to bill Medicare and Medicaid for the services provided by Prescriber 1 to

Defendants' patients. Concern for Prescriber 1's alcohol abuse was so great in 2019 that Defendants bought a breathalyzer for the sole purpose of testing Prescriber 1's alcohol level before Prescriber 1 started every shift.

28.    On November 4, 2019, Prescriber 1 called AmeriHealth to inform the clinic that Prescriber 1 could not work that day because Prescriber 1 was sick, hungover, and otherwise impaired. Prescriber 1 also informed the clinic that Prescriber 1 was sufficiently impaired that Prescriber 1 was unable to safely drive to the clinic.

29.    Defendants were angry that Prescriber 1 could not work because it meant that Defendants' clinic would have to cancel appointments which would result in Defendants losing revenue. Accordingly, Defendants instructed Medical Assistant 1 to "fetch" Prescriber 1 from Prescriber 1's residence and bring Prescriber 1 to the clinic. Medical Assistant 1 thereafter drove to Prescriber 1's residence, informed Prescriber 1 that Prescriber 1 had to work, and thereafter drove Prescriber 1 to the AmeriHealth medical clinic.

30.    Even though Prescriber 1 was sick, hungover and impaired, Defendants pressured and required Prescriber 1 to see and treat patients on November 4, 2019. Prescriber 1 treated multiple patients on November 4, 2019, for which Defendants billed insurance, including Medicare and Medicaid. Prescriber 1 also prescribed controlled substances to patients on November 4, 2019. Defendants caused Medicare and Medicaid to be billed for prescriptions issued by Prescriber 1 on November 4, 2019. In doing so, Defendants billed Medicare and Medicaid for worthless services.

### Prescriber 2

31.    Defendants hired Prescriber 2 as a Nurse Practitioner in 2018. At the time they hired Prescriber 2, Defendants knew or should have known that Prescriber 2 had never before

COMPLAINT – 8

prescribed controlled substances or treated pain management patients.  Nevertheless, Defendants assigned Prescriber 2 to work as a pain management provider and expected Prescriber 2 to prescribe controlled substances to patients.

32.     Though Prescriber 2 asked Defendants to train Prescriber 2 on how to provide pain management services, Defendants provided Prescriber 2 almost no training.

33.     Prescriber 2 treated Medicare and Medicaid patients as part of Prescriber 2's practice at AmeriHealth.  After treating those patients, Defendants referred, submitted, and/or caused to be submitted claims for reimbursement to Medicare and Medicaid for services rendered by Prescriber 2.

34.     Between 2018 and 2019, Prescriber 2 saw Patient A for foot pain, tinnitus, anxiety and other ailments.  Defendant wrote Patient A prescriptions for controlled substances to treat those conditions, including co-prescribing opioids, benzodiazepines, and sleeping medications for simultaneous use.

35.     Between 2018 and 2021, Prescriber 2 saw Patient B for chronic pain.  Defendant wrote Patient B prescriptions for controlled substances to treat that condition, including prescriptions for opioids like oxycodone.  Prescriber 2 knew other providers also prescribed controlled substances to Patient B, and that those other providers were prescribing benzodiazepines and sleeping medication that could react dangerously with opioids.

36.     Defendants directed Prescriber 2 to continue prescribing controlled substances to pain management patients even after Prescriber 2 expressed concern about Prescriber 2's lack of experience, and even after Defendants' medical director informed Defendants and Prescriber 2 that Prescriber 2's lack of experience was causing Prescriber 2 to issue unsafe and unlawful prescriptions that lacked a legitimate medical purpose.

37. Defendants caused Medicare and Medicaid to be billed for prescriptions issued to Patients A and B, as well as for office visits related to Prescriber 2's treatment of those patients. In doing so, Defendants billed Medicare and Medicaid for worthless services.

### Improper Relationship with Lab 1

38. In or around 2015, Defendants entered into a contract with Lab 1. Lab 1 provides urine drug testing services to health clinics and other medical practitioners.

39. Pursuant to the contract between Defendants and Lab 1, Defendants agreed to solicit and refer orders for urine drug testing to Lab 1. In return, Lab 1 agreed to bill insurance for those orders referred to it by Defendants, and thereafter pay Defendants standard and accelerated commissions based on claims paid by insurance, including Medicare and Medicaid.

40. At the time Defendants entered into the contract with Lab 1, Defendants employed one or more medical professionals that were in a position to refer urine drug testing to labs on behalf of Defendants. After entering into the contract with Lab 1, Defendants instructed its medical personnel, including doctors and nurse practitioners, to refer all orders for urine drug testing to Lab 1. This included urine drug testing orders for Medicare and Medicaid patients.

41. Between 2016 and 2022, Lab 1 processed orders for urine drug testing referred to it by Defendants pursuant to their contract. Lab 1 thereafter billed and collected money from insurance providers, including Medicare and Medicaid, for those orders referred to it by Defendants. Finally, Lab 1 paid Defendants commissions on a monthly basis, including commissions based on claims for reimbursement that Lab 1 submitted to Medicare and Medicaid. Lab 1's payment of these commissions and Defendants' receipt of these commissions violated the AKS and the FCA.

**Paycheck Protection Program Loans**

42.     As part of the Government's Covid-19 relief efforts, the Government established the Paycheck Protection Program (PPP) to keep businesses running and workers paid during the pandemic.  The program is and was administered by the Small Business Administration (SBA).

43.     Under the program, eligible businesses could apply for PPP loans so long as the businesses met certain conditions.  After receiving a PPP loan, those eligible businesses were permitted to seek forgiveness of those loans so long as the businesses used the PPP funds properly.  As part of the application and forgiveness process, businesses requesting PPP loans and forgiveness of PPP loans had to certify to certain facts and information under penalty of perjury.

44.     Defendant AAA American Healthcare, LLC applied for and received PPP loans on at least two occasions.  That entity also requested that both loans be forgiven.  As part of the application and forgiveness process, Defendants Ryan Hatch and Alban Hatch certified the truth of certain facts on behalf of Defendant AAA American Healthcare, LLC.  Among other things, Defendants Ryan Hatch and Alban Hatch certified that, (a) they were not engaged in illegal activity, (b) PPP funds would be used for eligible expenses, and (c) AAA American Healthcare, LLC suffered certain year over year (or quarter over quarter) losses that entitled the entity to PPP funds.

45.     On information and belief, Defendants falsely certified information as part of Defendant AAA American Healthcare, LLC's PPP loan and forgiveness applications.  This led Defendants to improperly acquire Second Draw PPP funds, and thereafter, to unlawfully obtain forgiveness of those funds.

COMPLAINT – 11

## VIII.  CLAIMS FOR RELIEF

### CLAIM #1
### Violation of 31 U.S.C. § 3729(a)
### Causing the submission of false claims for medical treatment to Medicare, Medicaid, and Tricare

46.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-45, as if set forth in full at this place.

47.     Between 2016 and 2022, Defendants' reckless hiring and supervision of multiple practitioners caused false claims to be submitted to Medicare, Medicaid, and Tricare related to medical services provided by the AmeriHealth clinics.  Among other things, the claims were false because they billed for services that were worthless or medically unnecessary.

48.     For example, on November 4, 2019, Defendants pressured Prescriber 1 to work at Defendants' medical clinic even though they knew or should have known Prescriber 1 was sick, impaired, and unable to safely make medical decisions, treat patients, or prescribe controlled substances to patients.

49.     Prescriber 1 treated four Medicare and eight Medicaid patients on November 4, 2019.  Defendants thereafter submitted claims to Medicare and Medicaid for the services provided to those patients by Prescriber 1 on November 4, 2019.

50.     The claims Defendants submitted to Medicare and Medicaid related to Prescriber 1's treatment of patients on November 4, 2019, were false and fraudulent.  The claims were false and fraudulent because Prescriber 1 was not physically or mentally able to safely or legitimately provide medical services on November 4, 2019.  As a result, Defendants billed the Government for worthless services.

51. Had Medicare and Medicaid known of Prescriber 1's condition on November 4, 2019, they would not have paid for the claims submitted by Defendants related to services performed by Prescriber 1 on that day.

52. Medicare was damaged in the amount of $190.16 when Defendants billed and submitted claims to Medicare for services rendered by Prescriber 1 on November 4, 2019. Medicaid was damaged in the amount of $246.59 when Defendants billed and submitted claims to Medicaid for services rendered by Prescriber 1 on November 4, 2019.

53. Another example of false claims involved Prescriber 2. On May 21, 2020, Prescriber 2 saw Patient B at the AmeriHealth clinic in Pocatello, Idaho. While the visit was ostensibly so that Defendant could provide pain management services to Patient B, in reality the principal purpose of the visit was so that Defendant could provide Patient B with prescriptions for controlled substances to manage pain.

54. After seeing Patient B on May 21, 2020, Defendants caused an office visit claim to be submitted to Medicare so that Defendants could be reimbursed for services provided to Patient B by Prescriber 2. Medicare paid $69.74 for the claim.

55. The office visit claim Defendants caused to be submitted to Medicare related to services provided to Patient B on May 21, 2020, was false. The claim was false because Defendants billed the government for a pain management visit even though Defendants knew or should have known that Prescriber 2 lacked the experience, training, or ability to provide pain management services. Defendants also knew or should have known that the principal purpose of the visit was so that Prescriber 2 could write prescriptions for controlled substances, as opposed to provide Patient B comprehensive pain management services. As a result of the claim

submitted to Medicare by Defendant, the government was billed for worthless services that Prescriber 2 was not qualified to provide.

56.     Had Medicare known Prescriber 2 lacked the experience, training, and ability to provide pain management services, and that Defendants submitted a claim based on the premise that Prescriber 2 was providing pain management services that Prescriber 2 was not qualified to provide, Medicare would not have paid for the claim.

57.     Medicare was damaged in the amount of $69.74 when it reimbursed Defendants for the May 21, 2020, office visit claim for Patient B.

58.     When Defendants, through their reckless hiring and supervision of medical practitioners, submitted or caused to be submitted numerous false claims to Medicare, Medicaid, and Tricare between 2016 and 2022, they violated 31 U.S.C. § 3729(a).  The United States is entitled to a civil penalty and treble damages to remedy each and every violation of the False Claims Act.  *See* 31 U.S.C. § 3729(a).

## CLAIM #2
### Violation of 21 U.S.C. § 842(a)(1)
**Dispensing controlled substances by means of invalid and unlawful prescriptions**

59.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-58, as if set forth in full at this place.

60.     Between 2016 and 2022, Defendants' reckless hiring and supervision of multiple practitioners led to the issuance of illegitimate prescriptions for controlled substances to patients seen at the AmeriHealth clinics.  Defendants did so to keep patients happy and returning for more office visits, which in turn allowed Defendants to make more money.  Among other things, the prescriptions were illegitimate because they were unsafe, issued outside of the usual course of professional practice, and issued without a legitimate medical purpose.

61.     An example of how Defendants' conduct resulted in the issuance of illegitimate prescriptions involved Prescriber 1.  On November 4, 2019, Defendants forced Prescriber 1 to treat and prescribe controlled substances to patients even though Defendants knew or should have known Prescriber 1 was sick, impaired, and unable to safely treat patients and prescribe medications and controlled substances.

62.     Defendants further knew or should have known that Prescriber 1 was not capable of assessing the legitimacy of prescriptions for controlled substances that Prescriber 1 wrote on November 4, 2019.  This resulted in Prescriber 1 writing prescriptions for dangerous drugs, including dangerous combinations of drugs.

63.     Prescriber 1 wrote twelve prescriptions for controlled substances to AmeriHealth patients on November 4, 2019.  Each of these prescriptions was unlawful, lacked a legitimate medical purpose, and was written outside the usual course of professional practice in violation of the CSA.  *See* 21 C.F.R. § 1306.04(a).  As such, the prescriptions were invalid and the dispensation of controlled substances pursuant to those prescriptions was unlawful.

64.     Defendants violated 21 U.S.C. § 842(a)(1) when they pressured and forced multiple practitioners, including Prescriber 1, to write and dispense controlled substances by means of invalid prescriptions written outside the usual course of professional practice between 2016-2022.  *See also* 21 C.F.R. § 1306.04.  The CSA authorizes civil penalties for up to $78,312 for each violation of 21 U.S.C. § 842(a)(1).  *See* 21 U.S.C. § 842(c); 28 C.F.R. § 85.5.

## CLAIM #3
### Violation of 31 U.S.C. § 3729(a)
### False Claims related to Anti-Kickback Violations

65.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-64, as if set forth in full at this place.

COMPLAINT – 15

66. Between 2016 and 2022, Defendants referred many orders for urine drug testing to Lab 1 on behalf of Defendants' Medicare and Medicaid patients. Defendants ensured orders were referred to Lab 1 by instructing its medical staff, including doctors and nurse practitioners, to refer all orders for urine drug testing to Lab 1.

67. Defendants referred orders for urine drug testing to Lab 1 pursuant to the contract Defendants signed with Lab 1, and Defendants knowingly referred such orders in exchange for commission payments from Lab 1. Defendants knew or should have known that those commission payments from Lab 1 to Defendants would be based on the number of orders referred to Lab 1 by Defendants and money collected from Medicare and Medicaid by Lab 1 related to those referrals.

68. The relationship and contract between Defendants and Lab 1, as well as the remuneration paid by Lab 1 to Defendants, violated the AKS and was unlawful.

69. Between 2016 and 2022, Lab 1 paid Defendants monthly commissions by check based on the urine drug test orders that Defendants referred to Lab 1 for Medicare and Medicaid patients. Defendants knowingly accepted that payment and remuneration, and further, Defendants understood that they were being paid money by Lab 1 in exchange for referring orders for urine drug testing to Lab 1. Defendants further knew and understood that they were being paid money by Lab 1 to induce Defendants to send additional referrals for urine drug testing. Defendants' conduct in accepting remuneration for referring medical services was unlawful.

70. Defendants' conduct caused Lab 1 to submit many claims for payment to Medicare and Medicaid related to urine drug testing. Each of those claims was false because the

claims resulted from the unlawful kickback scheme that improperly induced referrals for medical services in violation of the AKS.  *See* 42 U.S.C. § 1320a-7b(g).

71. Had Medicare and Medicaid known that Defendants had entered into an unlawful contract and relationship with Lab 1, it would not have paid for the urine drug testing claims submitted by Lab 1.

72. When Defendants caused Lab 1 to submit false claims for urine drug testing to Medicare and Medicaid, they violated the False Claims Act, *see* 31 U.S.C. § 3729(a).  The United States is entitled to a civil penalty and treble damages to remedy the violations.  *See* 31 U.S.C. § 3729(a).

## CLAIM #4
## Violation of 31 U.S.C. § 3729(a)
## False claims related to AAA American Healthcare, LLC's Second Draw PPP Loan

73. Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-72, as if set forth in full at this place.

74. On January 21, 2021, Defendants applied for a PPP Second Draw loan by filling out and submitting a Paycheck Protection Program Second Draw Borrower Application Form ("PPP Second Draw Application").  This application constitutes a "claim" for the purposes of the False Claims Act.

75. As part of their PPP Second Draw Application, Defendants certified that:

- AAA American Healthcare, LLC was eligible to receive PPP loans,

- All loan proceeds would be used for eligible business-related expenses,

- Defendants were not engaged in illegal activity,

- AAA American Healthcare, LLC had suffered a reduction in gross receipts in excess of 25%, and

- Defendants had used all First Draw PPP Loan funds for eligible purposes.

76. Based on Defendants' January 21, 2021, PPP Second Draw Application, the SBA awarded AAA American Healthcare, LLC a Second Draw PPP Loan in the amount of $783,802.50.

77. On July 23, 2021, Defendants submitted a PPP Loan Forgiveness Application seeking forgiveness of AAA American Healthcare, LLC's Second Draw PPP Loan. As part of that loan forgiveness application, Defendants again certified key information, including that all PPP loan funds would be used for eligible expenses. Defendants' application for loan forgiveness constitutes a "claim" for the purposes of the False Claims Act.

78. Based on the representations made in Defendants' PPP Second Draw Application (submitted January 21, 2021) and Defendants' PPP Loan Forgiveness Application (submitted July 23, 2021), the SBA forgave Defendants' PPP Second Draw Loan in the amount of $783,802.50.

79. On information and belief, Defendants made several material misrepresentations and false certifications on the January 21, 2021, PPP Second Draw Application and the July 23, 2021, PPP Loan Forgiveness Application. Among other things, Defendants misrepresented and falsely certified that they were not engaged in illegal activity and, further, that they used all First and Second Draw PPP Loan funds for eligible expenses. On information and belief, Defendants used PPP loan funds for non-eligible expenses, including personal travel and for home renovations.

80. Had SBA known of the material misrepresentations and false certifications, it would not have distributed or forgiven the PPP Second Draw Loan funds.

81. The Government has been damaged in the amount of $783,802.50.

82. When Defendants submitted the false claims for funds to SBA as part of their PPP loan and forgiveness applications, they violated 31 U.S.C. § 3729(a).  The United States is entitled to a civil penalty and treble damages to remedy the violations.  *See* 31 U.S.C. § 3729(a).

## CLAIM #5
### Common Law Fraud
### Fraud Related to AAA American Healthcare, LLC's Second Draw PPP Loan

83. Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-82, as if set forth in full at this place.

84. Defendants engaged in conduct designed to deceive SBA as to Defendant AAA American Healthcare, LLC's eligibility for receipt and forgiveness of a Second Draw PPP loan.

85. Defendants engaged in such conduct so that they would receive PPP loan funds from SBA and the federal government in the amount of $783,802.50.

86. Defendants made false statements and certifications to SBA in order to induce SBA into approving and forgiving AAA American Healthcare, LLC's Second Draw PPP Loan.  Those false statements and certifications concerned, among other things, whether Defendants were engaged in illegal activity, how Defendants used PPP loan funds that they received, and year-over-year losses sustained by AAA American Healthcare, LLC that impacted the entity's eligibility to receive PPP loans.

87. SBA was not aware of Defendants' false statements and certifications when it approved AAA American Healthcare, LLC's application for a Second Draw PPP Loan and Defendants' request for forgiveness of that Second Draw PPP Loan.  SBA was entitled to rely on Defendants false statements and certifications, and those statements were material to SBA's decision to approve and forgive Defendants' Second Draw PPP Loan.

88.     As a result of Defendants' false and fraudulent statements and certifications, the United States was damaged and is entitled to recover those damages.

## PRAYER FOR RELIEF

Based on the allegations described above, Plaintiff United States seeks the following:

(a) A declaration that Defendants violated the FCA and CSA as alleged in the Complaint;

(b) Judgment, civil penalties, and damages against Defendant for each violation of the CSA and FCA as authorized by 21 U.S.C. § 842(c), 31 U.S.C. § 3729(a), and outlined in the claims above;

(c) Interest at the legal rate from the date of entry of judgment; and

(d) Any other relief as this Court deems just and proper.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:

    */s/ Robert B. Firpo*
ROBERT B. FIRPO
Assistant United States Attorney

COMPLAINT – 20